UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANDREW EVANS and
RYAN GEHEB,

      Plaintiffs,

                               Case No. 24-10289

   v.

                             Hon. George Caram Steeh

MARK B. GORDON, Chief of Police at
Oakland University, SGT. BRADLEY BELDO,
P.O. CHRISTOPHER HARMON,
P.O. EMILY MCGRATH, LT. TERRY ROSS,
LT. NICOLE THOMPSON, JOHN & JANE DOE
OFFICERS, in their individual capacities,
jointly and severally; MICHAEL WADSWORTH,
Dean of Students, in his individual capacity,
JESSIE HURSE, Associate Dean of Students,
in his individual capacity, jointly and severally,

      Defendants.
_____/

OPINION AND ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION TO DISMISS (ECF NO. 24)

     Before the court is Defendants' motion to dismiss, which has been

fully briefed. For the reasons explained below, Defendants' motion is

granted in part and denied in part.

BACKGROUND FACTS

     This case arises from an incident that occurred on Oakland

University's campus on March 30, 2022. That evening, three friends –

- 1 -

Plaintiff Andrew Evans, Plaintiff Ryan Geheb, and Valance Washington –
were playing around with an orange and yellow toy Nerf gun. They were all
athletes on the university's swim team; Evans and Geheb are white,
Washington is black. Around six p.m., they drove to eat dinner in the
cafeteria. Geheb was driving, Washington was in the passenger seat, and
Evans was in the back seat. During the four-minute drive to the cafeteria,
Washington "suddenly and without warning" pointed the Nerf gun out the
window and yelled "Give me all your money!" to students walking on the
sidewalk. ECF No. 19 at ¶ 19. Washington thought he was being funny and
intended his actions as a joke. *Id.*

Geheb and Evans contend that they did not know that Washington
was going pull this prank and did not encourage him to do so. Among the
students that observed Washington's actions were Grace Edwards and
Rachel Stiteler. They were at first startled but, realizing the gun was fake,
continued into the cafeteria. *Id.* at ¶¶ 24-25.

After dinner, Edwards called the Oakland University Police
Department ("OUPD") to report the incident. She stated that an African-
American male in the front passenger seat of a vehicle yelled "Give me all
of your money!" She said that the car did not stop or slow down, and that
the gun had an orange tip and looked fake. *Id.* at ¶ 27. At the request of

OUPD, Edwards and Stiteler provided written statements. Both identified an African-American male as the person with the fake gun, and neither wanted to press charges. *Id.* at ¶¶ 28-29.

Based upon the information provided by Edwards and Stiteler, OUPD issued the following alert around 8 p.m.: "Police investigating attempted armed robbery in P-5 lot. Suspects may still be in the area. Caution advised. More information coming soon." ECF No. 19 at ¶ 30. This alert prompted Christine Fassett to phone OUPD dispatch. She told the operator that she saw an individual in a vehicle who had a bright orange gun that looked like a squirt gun; she interpreted the demand for money as a joke. *Id.* at ¶¶ 31-32. Police Officer Harmon followed up and asked if Fassett wanted to press charges. She declined because "it just seemed like a joke." *Id.* at ¶ 33.

Officers Harmon and McGrath used video footage from the OUPD camera system to identify the vehicle, which was registered to Geheb. Harmon and Sergeant Beldo then went to Geheb's residence at Hillcrest Hall. Geheb was not home. Washington answered the door and allowed the officers in. Washington was apologetic and explained that he pointed the Nerf gun, intended it as a joke, and that those he encountered laughed. *Id.* at ¶ 36.

- 3 -

Sgt. Beldo asked Washington to come to the station to give a statement, and to bring Evans and Geheb. Washington agreed. Returning to the station, Sgt. Beldo and Officer Harmon discussed the case with Lt. Ross. They explained that no one mistook the Nerf gun for an actual weapon, and no one wanted to press charges. *Id.* at ¶ 39. Sgt. Beldo consulted with Lt. Ross, Lt. Thompson, and Chief Gordon about how to proceed. According to the complaint, "[i]t was universally agreed that all three students should be arrested for armed robbery." *Id.* at ¶ 40.

Washington, Evans, and Geheb appeared at the police station to answer questions around 10 p.m. Officer Harmon took Washington into an interview room, but instead of asking questions, he placed Washington under arrest. Harmon then interviewed Geheb, who stated that he did not participate in the prank or encourage Washington to do so. He drove to dinner and back to his student apartment. After questioning Geheb, Harmon placed him under arrest for armed robbery. Similarly, Harmon questioned Evans, who also denied participating in the prank. Harmon placed Evans under arrest for armed robbery as well.

Washington, Evans, and Geheb were transported to the Oakland County Jail where they were booked for armed robbery and placed in the general population for the night. The next morning, they were released at

the request of Detective Shona Collins. Plaintiffs contend that Detective

Collins and the Oakland County Prosecutor's office recognized that there

were no grounds for their arrest. Chief Gordon then issued citations to

Washington, Evans, and Geheb for disturbing the peace, a misdemeanor

punishable by up to 90 days in jail. All three appeared in Rochester District

Court for a pretrial hearing on May 4, 2022, at which time the charges were

dropped.

Meanwhile, Oakland University pursued administrative action against

Washington, Evans, and Geheb. Michael Wadsworth, Dean of Student

Affairs, sent letters charging them with violating six sections of the student

code of conduct, suspending them from school, and banning them from

returning to campus without prior approval. ECF No. 19 at ¶ 67. Plaintiffs

contend that Wadsworth sent the letters without investigating and with

knowledge that there was no attempted robbery or threat of harm. *Id.* at ¶

68. A few days later, Wadsworth met with the three students, reinstated

their enrollment, and allowed them to return to campus.

The code of conduct charges remained. All three were charged with

the following violations: Disruptive Behavior, Weapons, Harm to Persons,

Threats, Intimidation, and Violations of Law. Wadsworth offered to reduce

the charges if the students agreed to accept responsibility and punishment.

Wadsworth offered to reduce Washington's charged violations from six to three counts – Disruptive Behavior, Threats, and Intimidation – if he agreed to accept the university's punishment, including probation for the duration of his time at the school. Wadsworth offered to reduce Evans and Geheb's charges to one count of Disruptive Behavior, which is defined as "causing, inciting or participating in any disturbance that endangers the health or safety of any person, causes physical harm to any person, or threatens or causes damage to and/or destruction of any property." ECF No. 19 at ¶ 82 n.2. All three students declined and requested a committee hearing, because they did not want to plead guilty to charges suggesting that they engaged in threatening or violent behavior. *Id.* at ¶ 85. They offered to serve the punishment recommended by Wadsworth, to avoid the stigma of an official university sanction. *Id.* at ¶ 86.

In response, Wadsworth stated that he was proceeding with all six original charges. Washington then agreed to accept responsibility, because he had a year left of school and athletic competition and was concerned that he might be expelled if he was found guilty of the more serious charges. Evans and Geheb maintained their request for a committee hearing.

- 6 -

Wadsworth contacted witnesses to obtain their testimony for the hearing. He reached out to Christine Fassett, who had declined to make a statement to police or press charges because the incident seemed like a joke to her. ECF No. 19 at ¶ 91. Plaintiffs allege that Wadsworth convinced Fassett to make a statement casting them in a more negative light. Fassett stated that she had "never felt unsafe [at OU] until this day" and that she was "scared" to take her dog out for a walk that night. *Id.* at ¶ 92. "I debated calling the OUPD and having them sit in the parking lot while I walked my dog." *Id.* Although Fassett told the police that the car was too far away for her to provide a description of the passengers, in her statement she said that the person holding the gun kept a straight face and did not laugh. *Id.*

Wadsworth also emailed two members of the women's soccer team, Sophie Wilsey and Noemi Stadelmann. They told Wadsworth that they knew the gun was not real and that they joked around with Washington, Evans, and Geheb about the incident in the cafeteria. *Id.* at ¶ 94. Wilsey and Stadelmann said they were willing to attend the committee hearing.

On April 10, 2022, Wadsworth informed Plaintiffs that the hearing would take place on April 15, which was Good Friday. Associate Dean Jessie Hurse emailed Plaintiffs the hearing packet on April 12, 2022, which included the charges and a list of witnesses. Although Wadsworth had

indicated that he was reinstating all six charges, Plaintiffs faced three: Disruptive Behavior, Threats, and Intimidation. The university's witnesses were identified as Fassett, Wilsey, and Stadelmann. The day before the hearing, Wadsworth confirmed that all three would be attending.

Washington was not on the university's witness list. Wadsworth told the committee that Washington would not be attending because he admitted responsibility for the violations. ECF No. 19 at ¶ 102. Washington was afraid to testify on behalf of Evans and Geheb because he had just been placed on probation by Wadsworth. *Id.*

The hearing was conducted on Zoom by Associate Dean Hurse. Plaintiffs contend that Wadsworth remained in contact with Hurse, advising him how to proceed. *Id.* at ¶ 106. The university called Fassett as its only witness. She admitted that neither Geheb nor Evans threatened, harmed, intimidated, placed her in fear, or disrupted or interfered with her academic or non-academic pursuits at the university. *Id.* at ¶ 108. As a result, Plaintiffs allege, the "university's only witness negated every element of every charged code of conduct violation." *Id.*

Neither Wilsey nor Stadelmann attended the hearing; Plaintiffs maintain that Wadsworth intentionally hindered their ability to do so. He sent a Zoom invitation to Wilsey, but she was out of the country. Plaintiffs

allege that Wadsworth knew this five days before the hearing, but never

told Plaintiffs that Wilsey would be unavailable. Wadsworth also never sent

a Zoom link to Stadelmann. *Id.* at ¶¶ 109-10. About forty-five minutes

before the hearing, he reached out to Stadelmann by email because she

had not accepted the Zoom invitation. This email did not include a Zoom

link so that Stadelmann could attend. *Id.* Plaintiffs would have asked for an

adjournment had they known that the witnesses most favorable to them

were not available. *Id.* at ¶ 112. Wadsworth led them to believe that Wilsey

and Stadelmann would appear and confirmed their attendance before the

hearing. *Id.* at ¶¶ 100-101.

Evans and Geheb testified on their own behalf, explaining that they

did not participate in the prank and did not encourage Washington. Geheb

drove his teammates to and from the cafeteria for dinner, and Evans was a

passenger in the car. Plaintiffs allege that they tried to introduce letters

from character witnesses, but that Wadsworth would not allow it, contrary

to section ten of the university's due process standards. *Id.* at ¶¶ 114-15.

Evans and Geheb gave closing statements, and then the committee

members went into a private breakout room to deliberate. Plaintiffs contend

that there was no evidence that either student engaged in disruptive,

threatening, or intimidating behavior. *Id.* at ¶ 116. After about twenty

minutes of deliberations, it appeared that the committee members were having difficulty reaching a decision. *Id.* at ¶ 117. Plaintiffs allege that Hurse entered the breakout room with the committee members and "began to engage in improper *ex parte* communications." *Id.* Plaintiffs contend that Hurse convinced the committee to hold them responsible for code of conduct violations despite the lack of evidence. *Id.* at ¶ 118. Hurse wanted the committee to reach the same result had been reached in Washington's case. *Id.* The committee ultimately held Plaintiffs responsible for Disruptive Behavior and Intimidation, but not responsible for Threats.

Plaintiffs were placed on disciplinary probation for the remainder of the year and ordered to write a two-thousand-word reflection paper on how their behavior impacted the university community. They were also required to serve as ushers at the 2022 graduation ceremonies, except their own. Plaintiffs state that they timely filed a notice of appeal of the committee's decision, but they were hampered in their ability to appeal because the Dean's office refused to release the Zoom recording or provide a transcript or witness statements.

Plaintiffs sued Dean Wadsworth, Associate Dean Hurse, Chief Gordon, Sgt. Beldo, Officer Harmon, Officer McGrath, Lt. Ross, and Lt. Thompson pursuant to 42 U.S.C. § 1983 for violating their constitutional

rights. Against the police officer defendants, Plaintiffs allege claims of false arrest and malicious prosecution arising under the Fourth Amendment (Counts I and II). Plaintiffs allege that Wadsworth and Hurse violated their Fourteenth Amendment rights to procedural due process and equal protection under the law (Counts III, IV, and V). Defendants seek dismissal of Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

LAW AND ANALYSIS

I.   Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 319 (6th Cir. 1999) (internal quotation marks omitted).

When ruling on a motion to dismiss, the court may "consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's

motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

II.    Police Officer Defendants

The defendants who are police officials argue that they are entitled to qualified immunity, which shields officials from civil liability if their conduct "does not violate clearly established rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In determining whether a defendant is entitled to qualified immunity, the court analyzes "(1) whether, considering the allegations in the light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Richmond v. Huq*, 885 F.3d 928, 947 (6th Cir. 2018) (citation omitted). At the motion to dismiss stage, this is "a low bar," because "granting qualified immunity at the motion to dismiss stage is usually disfavored." *Marvaso v. Sanchez*, 971 F.3d 599, 605-606 (6th Cir. 2020). The Sixth Circuit has cautioned that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity. Although an officer's 'entitle[ment] to qualified immunity is a threshold question to be resolved at the earliest possible point,' that point is

usually summary judgment and not dismissal under Rule 12." *Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015) (citations omitted).

Plaintiffs' false arrest and malicious prosecution claims arise under the Fourth Amendment and require them to show that there was a lack of probable cause for their arrest and prosecution. *See Hartman v. Thompson*, 931 F.3d 471, 483, 485 (6th Cir. 2019). "The constitutional right to 'freedom from arrest in the absence of probable cause' is clearly established within our circuit. Therefore, to survive the motion to dismiss, [Plaintiffs] must allege facts that make out a plausible violation of that constitutional right, *i.e.* that [their] arrest was unsupported by probable cause." *Courtright v. City of Battle Creek*, 839 F.3d 513, 520-21 (6th Cir. 2016) (citations omitted).

"A police officer has probable cause for arrest if, at the time the officer makes the arrest, 'the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense.' In other words, probable cause exists only when the police officer 'discovers reasonably reliable information that the suspect has committed a crime.'" *Courtright*, 839 F.3d at 520-21 (citations omitted). A probable cause determination is based

upon the "totality of the circumstances," including inculpatory and exculpatory evidence. *Id.* The analysis is conducted based upon the knowledge the officer had at the time of the arrest, "rather than with the 20/20 vision of hindsight." *Id.* "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000).

Although Plaintiffs were arrested for armed robbery, Defendants do not maintain that there was probable cause to support such a charge. Rather, they argue they are entitled to qualified immunity as long as there was probable cause to support Plaintiffs' arrest on *any* potential charges. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (holding that the offense establishing probable cause need not be "closely related to, and based on the same conduct as, the offense identified by the arresting officer at the time of the arrest").

Defendants point to various crimes for which there was allegedly probable cause to arrest Plaintiffs, such as aiding and abetting or violations of disturbance-based ordinances. They urge the court to make this finding based upon a partial record, which is contrary to the requirement that probable cause be determined based upon the totality of the

circumstances. For example, Defendants provide the police interview of Geheb, but not Evans, and have not provided surveillance footage reviewed by officers before Plaintiffs were arrested. An analysis of all the evidence reviewed by the officers involved is necessary before the court may determine whether the police defendants' probable cause determination as to each Plaintiff was reasonable or whether factual disputes require submission to a jury. Viewing the factual allegations in Plaintiffs' favor, neither Geheb nor Evans was identified as participating in Washington's prank or engaging in criminal conduct. *See generally People v Norris,* 236 Mich App 411, 419-20 (1999) ("Mere presence is not enough to find someone aided and abetted a crime, even with knowledge that an offense is about to be committed or is being committed.").

Plaintiffs plausibly alleged that they were arrested and prosecuted without probable cause. A definitive ruling on probable cause, at this stage of the proceedings, is premature. The fact-intensive nature of the probable cause determination illustrates the "often perilous" nature of granting qualified immunity at the motion to dismiss stage. *See Singleton v. Commonwealth of Kentucky*, 843 F.3d 238, 242 (6th Cir. 2016) ("I]t is often perilous to resolve a Rule 12(b)(6) motion on qualified immunity grounds given the fact development often needed to decide whether the state

official violated clearly established federal law.). The police officers' motion to dismiss the claims against them (Counts I and II) is denied.

    III.   University Defendants

    A. Due Process

Plaintiffs allege due process and equal protection claims against the university defendants, Wadsworth and Hurse. They contend that their temporary suspension by Wadsworth violated their due process rights. "For a procedural due process claim, a plaintiff must establish a constitutionally protected liberty or property interest and show that such an interest was deprived without appropriate process." *Midkiff v. Adams Cty. Reg'l Water Dist.*, 409 F.3d 758, 762 (6th Cir. 2005). A temporary suspension from a public school implicates a property interest in a public education as well as a liberty interest in one's reputation. *Goss v. Lopez*, 419 U.S. 565, 576 (1975). The Supreme Court has held that "students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing." *Id.* at 579. Depending on the circumstances, the notice and hearing may be informal. "[D]ue process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against

- 16 -

him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581.

At a minimum, due process requires "at least an informal give-and-take between student and disciplinarian, preferably prior to the suspension." *Goss*, 419 U.S. at 584. Although notice and a hearing should generally "precede removal of the student from school, . . . [T]here are recurring situations in which prior notice and hearing cannot be insisted upon. Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school. In such cases, the necessary notice and rudimentary hearing should follow as soon as practicable." *Id.; see also Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 565 (6th Cir. 2011).

Plaintiffs allege that Wadsworth suspended them for four days without notice or an opportunity to be heard. They were not given an opportunity to present their side of the story prior to the suspension. They further allege that there was no evidence that their presence at the university posed a continuing danger to persons or property, or an ongoing disruption, justifying their immediate removal. Consistent with *Goss*, these allegations sufficiently state a claim that Wadsworth violated clearly established law. *See also Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018)

("[I]f a student is accused of misconduct, the university must hold some sort of hearing before imposing a sanction as serious as expulsion or suspension."). Defendants' motion to dismiss Count III is denied.

Plaintiffs also allege that Wadsworth and Hurse were biased against them and tainted the code of conduct hearing. Defendants argue that this claim should be dismissed on ripeness grounds, because Plaintiffs did not take advantage of the process available to appeal their discipline. Plaintiffs argue that they are not required to exhaust state remedies to bring an action under § 1983. *See Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 507 (1982). Although this general statement is accurate, in this context the availability of state procedures is nonetheless relevant to whether Plaintiffs can maintain a procedural due process claim. "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (emphasis in original). In other words, "[t]he constitutional violation actionable under § 1983 is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process. Therefore, to determine whether a constitutional violation has occurred, it is

- 18 -

necessary to ask what process the State provided, and whether it was constitutionally adequate." *Id.*

Therefore, "[i]n order to state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate." *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000). This is not an exhaustion requirement, but reflects "the logical proposition that a state cannot be held to have violated due process requirements when it has made procedural protections available and the plaintiff has simply refused to avail himself of them." *Dusanek v. Hannon*, 677 F.2d 538, 542-43 (7th Cir. 1982); *accord Alvin*, 227 F.3d at 116 ("[A] procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies."); *Farhat v. Jopke*, 370 F.3d 580, 597 (6th Cir. 2004); *Krentz v. Robertson*, 228 F.3d 897, 904 (8th Cir. 2000).

Plaintiffs had the opportunity to appeal the outcome of their code of conduct hearing to the Vice President of Student Affairs, based upon new evidence or procedural error. Although Plaintiffs filed a notice of appeal,

they did not pursue it.[1] Plaintiffs have not alleged that the appeal process is constitutionally inadequate. Accordingly, Plaintiffs have failed to state a procedural due process claim based upon the allegedly tainted code of conduct hearing (Count IV). *See id.; Peloe v. Univ. of Cincinnati*, 2015 WL 728309, at *7 (S.D. Ohio Feb. 19, 2015) ("Peloe filed this suit after the first step of a multi-step procedure, denying UC the opportunity to provide him procedural due process.").

B. Equal Protection

Plaintiffs allege that Wadsworth and Hurse used race as a motivating factor in determining the charges to be brought against them and their punishment. They contend that Wadsworth and Hurse sought to bring the same charges and impose the same punishment against them as they did against Washington, "to avoid the negative optics of punishing an African American student more severely than his white teammates." ECF No. 19 at ¶ 163.

---

[1] Plaintiffs allege that their ability to appeal was stymied because the university would not release the Zoom recording of the hearing or a transcript. However, the Sixth Circuit has held that a transcript is not constitutionally required. *Doe v. Michigan State Univ.*, 989 F.3d 418, 428 (6th Cir. 2021) ("[W]hile the Constitution does require that 'the student be provided the evidence against him,' there is no indication that this evidence includes the transcript of a *Baum* hearing.").

The Equal Protection Clause of the Fourteenth Amendment prohibits a state from denying a person equal protection of the law. "To establish an equal-protection violation, a plaintiff must allege that the state made a distinction which 'burden[ed] a fundamental right, target[ed] a suspect class, or intentionally treat[ed] one differently from others similarly situated without any rational basis for the difference.'" *Doe v. Miami Univ.*, 882 F.3d 579, 595 (6th Cir. 2018). "School officials violate the Equal Protection Clause when they punish a student more severely for his conduct than other students because of the student's race." *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 570-71 (6th Cir. 2011). "Direct or circumstantial evidence that a student's race motivated school officials' actions may establish an Equal Protection Clause violation." *Id.*

Plaintiffs have not alleged that they were treated differently from similarly situated individuals, nor have they alleged facts raising an inference that they were treated more harshly because of their race. Plaintiffs assert that they were treated the same as Washington, despite less culpable behavior. In other words, Plaintiffs believe they were treated more harshly than they should have been. Missing from Plaintiffs' allegations, however, are facts that would raise an inference that Wadsworth or Hurse's actions were motivated by race. In this regard,

Plaintiffs offer only conclusory allegations, which are insufficient. *Cf. Heyne*, 655 F.3d at 571 (holding the plaintiff stated an equal protection claim when allegations included that the school principal "had instructed the staff at a meeting to be more lenient in enforcing the Code of Conduct against African-American students because too many African-American students were serving in-school suspensions"). Accordingly, the court will dismiss Count V.

## ORDER

IT IS HEREBY ORDERED that Defendants' motion to dismiss is DENIED as to Counts I, II, and III and GRANTED as to Counts IV and V.

Dated: December 3, 2024

s/George Caram Steeh
HON. GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record
on December 3, 2024, by electronic and/or ordinary mail.

s/LaShawn Saulsberry
Deputy Clerk